Mound City Paint & Color Co. v. Conlon.

| 92 | 221 |
|-----|------|
| 109 | 392 |
| 92 | 221 |
| 125 | 674 |
| 92 | 221 |
| 100a | 449 |

MOUND CITY PAINT AND COLOR COMPANY v. CONLON, *Appellant.*

1. **Master and Servant:** WHEN THE RELATION EXISTS. The relation of master and servant only exists where the person sought to be charged as master for the act of the servant either employed or controlled the servant, or had the right of control over him at the time the injury sued for happened, or expressly or tacitly assented to the rendition of the particular service by him. He must at the time have had the right to direct the action of the servant and to accept or reject its rendition by him.

2. ———: SERVANT DISOBEYING MASTER'S INSTRUCTIONS. The fact that the servant disobeys the instructions of the master does not relieve the latter from liability.

3. **Instructions.** Instructions which present issues not raised by the pleadings and are calculated to mislead the jury should be refused.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

*Madill & Ralston* for appellant.

(1) Independently of the relation of master and servant, defendant, Conlon, cannot be held liable on the ground that Archibald was his agent in doing the digging which destroyed the building, and acted under his directions, unless the evidence showed to the satisfaction of the jury that defendant either directed, authorized,

ratified, or adopted the acts of Archibald in doing said digging. Defendant's evidence showed (and the jury so found in each case under instructions very favorable to the plaintiff) that he neither directed, authorized, adopted, nor ratified the acts of Archibald in doing said digging. On the contrary, defendant's evidence shows that he expressly prohibited it, so far as he possibly could, and plaintiff's evidence shows that Archibald's employers, Lynds & Company, had done likewise. Hence, defendant Conlon is not liable on the law of principal and agent. Story on Agency [9 Ed.] secs. 455–6, p. 557, *et seq.*, and sec. 451, p. 518 and note; *Hilliard v. Richardson*, 3 Gray, 349–50–66. (2) Defendant's evidence showed clearly that the relation of master and servant had not commenced to exist between defendant and Archibald, at the time the digging was done that caused the building to fall. As the building fell before it was shored up by defendant, Archibald never became the servant of defendant, and defendant is under no liability for his acts, negligent or otherwise. The relation of master and servant, at the time of the injurious acts, must exist, and constitutes an absolute condition precedent to any liability on the part of the alleged master. Wood on Master and Servant (1877), sec. 281, pp. 537–38, and note 2, sec. 304, pp. 580–81–82–83; 2 Thomp. on Neg., p. 899, sec. 21, and cases cited; Story on Agency [9 Ed.] sec. 451, p. 518, note; 1 Parsons on Cont. [5 Ed.] bk. 1, ch. 5, p. 102. (3) To render a master liable for the negligent acts of a servant (or agent), the negligent acts must be done in the "course," "scope," or "range," of the servant's employment, and upon authority from the master, express or implied, and they must not be done as the acts of the servant himself, or in order to effect some purpose of his own, or of a third person. Wharton on Neg., secs. 162–188; Cooley on Torts (1879), 534–535; Wood on Master and Servant (1877), secs. 279, 281, 286, 304; Story on Agency [9 Ed.]

sec. 451, note; *Stevens v. Woodward*, L. R. 6 Q. B. D. 318; *Douglass v. Stephens*, 18 Mo. 362; *Garretzen. v. Duenckel*, 50 Mo. 107-8; *Snyder v. Railroad*, 60 Mo. 413-18-19. (4) Under the conflicting testimony, the questions whether defendant directed Archibald to do the acts complained of, or whether he was the servant of defendant at the time they were done, or whether he did said acts, as said servant, within the course of his employment, or whether he did them under his express or implied contract with Lynds & Company, and not as the employe of defendant, or under a contract with him, were all questions of fact to be determined by the jury, in view of the employment, its character, and the circumstances under which the acts were done. Wood on Master and Servant (1877), sec. 286; 2 Thomp. on Neg., p. 899, sec. 21; *McKenzie v. McLeod*, 10 Bing. 385; *Mitchell v. Crasweller*, 13 C. B. 237; *Limpus v. Omnibus Co.*, 1 H. & C. 526; *Ward v. Omnibus Co.*, 42 L. J. C. P. 265; *Burns v. Poulson*, L. R. 8 C. P. 563-68-71; *Redding v. Railroad*, 3 S. C. 1; *Stevens v. Woodward*, L. R. 6 Q. B. D. 318-22; *Marion v. Railroad*, 59 Iowa, 428-30. All questions of fact were submitted to the jury under proper instructions. Taken singly, or together, they correctly declared the law, and were not calculated to mislead. *Myers v. Railroad*, 59 Mo. 231; *Karle v. Railroad*, 55 Mo. 476-82. (5) The fact that defendant, after the fall of the building, paid Archibald for a load of lime and sand, which had been covered up by the fallen building, did not establish the relation of master and servant between them, or render defendant liable for the negligence and wrongful acts of Archibald. *Coomes v. Houghton*, 102 Mass. 211-13; *Rayner v. Mitchell*, L. R. 2 C. P. D. 357. Archibald never demanded or received any pay from defendant for the digging done by him, which it is alleged he did as the servant of defendant. (6) Defendant Conlon was the agent of Charles Green, administrator of Boucher,

and is not, therefore, liable in either of these cases on any principle of *non-feasance*, either under the pleadings, the evidence, or the law. Story on Agency [9 Ed.] sec. 308; *Harriman v. Stowe*, 57 Mo. 93-98.

*W. C. Marshall* and *Phillips & Stewart* for respondent.

(1) The testimony of witness, Breslin, as to conversations with the rock-masons, wherein they told him that the hole he was digging was to be used as a foundation course for the rock wall, was incompetent. The only contention by appellant here in support of the admission of this testimony is, that it is part of the *res gestæ*. Statements of third persons in nowise connected with the transaction, and in the absence of the parties to the contract and transaction, form no part of the *res gestæ*. And *Harriman v. Stowe*, 57 Mo. 93, is no authority for appellant on this proposition. (2) Defendant's third instruction is erroneous, because there is not a particle of evidence in the case to warrant such a theory. (3) Defendant's fourth instruction is erroneous. (*a*) Because the first part assumes that there was some evidence that Archibald did this excavating under some other contract than the one he had with defendant, when the evidence was positive and uncontradicted to the contrary. (*b*) Because the last part is inconsistent with the first part. (*c*) Because there was no evidence to base such an instruction on. (4) Defendant's fifth instruction is erroneous. (*a*) Because there was no evidence to base it on. (*b*) Because, even if the "terms" of the contract prescribed that Archibald was not to begin work until the building was shored up, such "terms" were only as to the time when the work was to be done, and in nowise related to the existence of the relation of master and servant; and disobedience of such "terms" is like disobedience of any other instructions of the mas-

ter as to the time when, or the mode in which, any act done by the servant should be done. *Lattman v. Barrett*, 62 Mo. 159; *Harriman v. Stowe*, 57 Mo. 93; *Morgan v. Cox*, 22 Mo. 373; *Reens v. Larkin*, 19 Mo. 192; *Douglass v. Stephens*, 18 Mo. 362; *Minter v. Railroad*, 41 Mo. 503; *Garretzer v. Duenckle*, 50 Mo. 104; 2 Thompson on Neg., 900, *et seq.; Ibid*, p. 889, sec. 6. (5) Archibald became defendant's servant at 7:30 o'clock on the day the building fell, at the latest; the instant the agreement between them was made. He did this work at two P. M., contrary to orders, if you please, but while he was defendant's servant. The work he did, had necessarily, to be done at some time, in order to carry out his employment with defendant. The time when he was to do it is not material, for that was no part of the contract. The contract of service was executed, not executory, whilst the work to be done was *in futuro*, and also *in praesenti*.

BLACK, J.—The plaintiff, a corporation, brought this suit to recover damages done to its goods by the falling of the south wall of the brick building known as number 704, on Second street, in St. Louis. The wall, it is alleged, fell by reason of the negligence of defendant, who had been employed by the owner of the property to underpin it. Mr. Snyder was the contractor for the erection of a new house on property south of and adjoining the wall, and he had employed Mr. Archibald to excavate the cellar, which had been done to the depth of nine feet, three or four feet below the wall to 704; but Archibald had left next to the wall a retaining bank of earth as a support until the wall should be made safe. The third instruction and a part of the fourth, given at the request of defendant, proceed upon the hypothesis that at the time the building fell, Archibald was not acting under his employment with

the defendant, but in the execution of his contract with Snyder for the excavation of the basement of the new building. Another part of the fourth and the fifth are based upon the theory that if Archibald was not to begin the work of underpinning the wall until defendant had shored up the building, and that the building fell before the shoring had been done, then Archibald was not the servant of the defendant, and defendant was not liable for Archibald's acts.

It was urged that there was no evidence which warranted the giving of these instructions, containing the proposition before stated, and that they were designed to mislead the jury. Mr. Archibald, in substance, testified: "I agreed with Conlon at least four days before the wall fell to take charge of the excavating and walling, that is the underpinning, at four dollars a day and commissions on each day's outlay; he told me to let him know when he could get the braces in the cellar, and I went to see him on three different days, but could not find him; he came to the cellar on the morning of the day the wall fell and told me to commence digging on Second street, to dig square down, but not to undermine, and he would go home and his men would be there with shores in an hour; said he thought the building was pretty safe; I told him Mr. Snyder was anxious, and I felt anxious myself about the wall; said he would have his men there immediately and put up the shores; my men commenced at the end of the cross wall on Second street and took the width of that out so we could get to the depth we had to go, and then drift under the wall, according to Conlon's instructions; at four o'clock when I left, my man had gone straight down and had not got to the bottom of where we had to go; had not got to the bottom of the excavation I had to make for Snyder; when I came back the building was down; had lime and ·sand on the ground ready and had made

arrangements with the mason on the other wall for the stone."

Mr. Conlon testified : " Saw Archibald three or four days before the wall fell, but did not make any arrangement with him then. The next time I saw him (Archibald) was the morning of the day the building fell. I then made arrangements with him to take the dirt from under the wall and do the underpinning for four dollars a day for his own services and a commission on the men he would employ.

*Q.  " What did you say to him about it when it was to be commenced ?   A.  As soon as we would have the shoring done.*

*Q.  " What did you tell him on the subject ?   A.  I told him not to take a pound of dirt out from under the wall until he had shored it up ; he said he thought it was perfectly safe ; said I, that may be, but it will be still safer when we get the braces up and I don't want you to touch a pound of dirt till that is done.*

" I told him I would order the poles right away, and I supposed they would be down in an hour or two. My foreman was present at this conversation, which was about half-past seven or a quarter to eight o'clock in the morning. *I instructed my foreman about bracing up and not allowing any dirt to be taken from under the wall till he had his shores put up, before I left.* I had nothing to do with the bank of dirt. All I had to do was to take the dirt from under the wall and do the underpinning."

Carney, who was Conlon's foreman, states that he went to the cellar in the morning and stayed there until four o'clock in the afternoon; that he was preparing for the braces; that Conlon directed him to see that no dirt was dug from the wall; that he saw the laborer and told him to quit, but the latter said that he (Carney) was not his boss.

David Breslin, the laborer, who dug out the hole at

the corner, speaks of it as a trench, but says he does not know what it was for. It may be stated here that what the stone-masons said to him was incompetent evidence and should have been excluded.

Besides the foregoing evidence, it appears that masons under Snyder were at work on the end wall of the new house, on Second street, had extended that wall up to within six or eight feet of the wall of 704; and there is evidence tending to show that the trench or hole dug on the day the wall fell was in a continuation of that wall. This circumstance, and the fact that Archibald's contract with Snyder required him to remove all the earth to a depth of nine feet, are urged as proof that Archibald was then at work in the execution of his contract with Snyder. But the proof is undisputed that Snyder had forbidden the removal of the bank of earth, and that in other respects the cellar had been excavated for ten days. It was no part of Archibald's contract to dig the trenches for the foot-courses of the walls to the new house. The wall to 704 could not be underpinned without throwing the bank of retaining earth back in short sections, and it was this at which the laborer under Archibald was engaged, no braces having yet been put up when the wall fell. We do not see any evidence tending to show that Archibald was at the time the wall fell performing his contract with Snyder, but it all tends to show that he was then working for Conlon. It may be that Archibald was bound to remove the earth from the cellar after the wall was underpinned in virtue of his contract with Snyder, but be that as it may, the evidence is all to the effect that, by the direction of Snyder and the agreement of Archibald, the work of excavating the cellar had ceased for the wall of 704 to be made safe.

Saying nothing about the evidence of Archibald, which directly contradicts that of Conlon, still the evidence of Mr. Conlon shows that he and his foreman and

Archibald were all in the cellar when the latter was employed to work by the day; and Archibald then had lime and sand on the ground to go on with the work. They all expected the shores to be on hand in one or two hours, and the foreman was charged with the duty of preventing the removal of any earth until the shores were up. The contract was a present engagement, and the very most that can be said of the evidence is, that it tends to show that Archibald disobeyed the directions of his employer by commencing work before the shores were up. In Wood on Master and Servant, section 306, it is said: "The relation of master and servant only exists where the person sought to be charged as master either employed or controlled the servant, or had the right of control over him at the time when the injury happened, or expressly, or tacitly assented to the rendition of the particular service by him. He must, at the time, have had the right to direct the action of the servant and to accept or reject its rendition by him." To the same effect is Cooley on Torts, 533. The fact that the servant disobeys the instructions of the master does not relieve the latter from liability. *Garretzen v. Duenckel*, 50 Mo. 104. There can be no doubt, from the evidence of Conlon himself, that Archibald was under his control and that of his foreman during the time the digging was done on the day the wall fell, and while they were waiting for the shores.

Instructions three, four, and five, therefore, present issues not fairly raised by the evidence, *i. e.*, that Archibald was, at the time the wall fell, engaged in the execution of his contract with Snyder, and that there was an arrangement or contract between defendant and Archibald, whereby the latter was not to commence work until defendant had shored up the wall; the instructions, as prepared, could but mislead the jury and should have been refused. The judgment of the court of appeals, reversing that of the circuit court, is affirmed. All concur.