Decided 10 June, 1901.

### SWACKHAMER *v.* JOHNSON.

[54 L. R. A. 625; 65 Pac. 91.]

LIABILITY FOR ACTS OF SERVANTS HIRED TO ANOTHER.

Where a promoter contracted with an employment agent to furnish laborers and a foreman, who should work at such times and places on a proposed railroad as they should be directed by and under the supervision of the promoter and his superintendent and engineer, and the promoter, in order to secure the employment agent, assigned a subsidy contract to him, the laborers so furnished were the servants of the promoter, and not of the employment agent to whom the subsidy contract was assigned, and hence no recovery for injuries to third persons, committed by the laborers, could be had against such agent; for he had no control over them as to the time, place, or manner of their working.

From Union :   ROBERT EAKIN, Judge.

This is a suit by S. O. Swackhamer against Joseph Johnson, Ung Cuey, the Wing Chin Lung Company, and Lee Tung Yin, to enjoin a trespass upon real property and to recover damages for injuries thereto.   The facts are that the defendant Joseph Johnson, having conceived the project of building a railroad from Union, Oregon, to Bear, Idaho, and being without means to execute his proposed scheme, certain citizens of Union, on June 8, 1898, to promote that city's growth, entered into a contract with him whereby they agreed to donate a right of way for said railroad through the corporate limits of Union, six acres of land therein for depot facilities, and the sum of $3,500 upon the construction of the first ten miles of railway.   The plaintiff agreed with said citizens to donate the depot grounds required by them, but, Johnson having demanded a greater area than specified, the plaintiff on August 18, 1898, in consideration of the sum of $217, paid for Johnson by said citi-

zens, and Johnson's agreement to pay the further sum of $283, executed a deed to him for twelve acres of land in said city, which he deposited with the First National Bank of Union, to be delivered upon the payment of the remainder of the purchase price, if the first ten miles of said railway were completed within six months. The land so selected for depot purposes and right of way therefrom across plaintiff's premises was covered with valuable timber, which afforded security to his stock as a wind-break for their protection against the inclemency of the weather. Johnson on October 5, 1898, entered into a contract with Lee Ching Duck and Lee Tung Yin, partners as the Wing Chin Lung Company, and Ung Cuey, whereby they agreed to furnish him forty Chinese laborers to work upon said railroad for $1.10 each per day, except a bookman or foreman, for whose service they were to be paid the sum of $1.25 per day, the contract providing that the laborers so to be furnished "shall perform work faithfully, and at such times and places upon said line of railway as they may be directed by and under the supervision of the party of the first part (Johnson) and his superintendent or engineer." After this contract was consummated, but before any laborers were furnished, Johnson, to secure Lee Tung Yin, assigned the subsidy agreement and conveyed all his interest in the depot grounds to him, and so notified the citizens' committee, the First National Bank of Union, and the plaintiff; but the latter refused to yield his consent thereto. The laborers were sent to Union in charge of a bookman or foreman selected by the Wing Chin Lung Company, where, in pursuance of Johnson's orders, and without the knowledge of the parties sending them or of the plaintiff, they cut down most of the timber growing upon the land set apart for depot purposes and on the right of way leading therefrom across the plaintiff's premises. The first

ten miles of said railroad were never constructed, and, the project having been abandoned by Johnson, who left the country without paying the Wing Chin Lung Company any part of the expense of about $3,000 incurred on account of the laborers so furnished, plaintiff commenced this suit, but, having served a summons upon Lee Tung Yin only, and the other defendants not having appeared, a trial was had, resulting in a decree perpetually enjoining any further trespass upon plaintiff's premises, and awarding him the sum of $750 as damages, from which Lee Tung Yin appeals.        ·        REVERSED.

For the appellant there was a brief over the names of *J. M. Carroll* and *Fenton, Bronaugh & Muir*, with an oral argument by *Mr. William T. Muir*.

For respondent there was a brief over the names of *Thomas H. Crawford* and *B. F. Wilson*, with an oral argument by *Mr. Crawford*.

MR. JUSTICE MOORE, after stating the facts, delivered the opinion of the court.

It is argued by appellant's counsel that the plaintiff consented to the cutting of the timber, and hence, invoking the maxim, *Volenti non fit injuria*, that the decree is erroneous.   But the court found that no agreement had ever been entered into by the plaintiff with Johnson, or any other person, for a right of way for said proposed railroad, nor had any license been granted by him whereby said timber might be cut, and, as the preponderance of the testimony, in our judgment, supports such finding, it will not be disturbed.   The timber having been cut by the Chinese laborers without any license therefor, the question to be considered is whether Lee Tung Yin was at that time their master, and therefore liable for the

39 OR.—25.

damage which they caused, for the principle of *respondeat superior* is founded upon the maxim, *Qui facit per alium, facit per se*, and, unless such relation existed at the time the trespass was committed, the appellant is not liable therefor : *Boswell* v. *Laird*, 8 Cal. 469 (68 Am. Dec. 345); *Blake* v. *Ferris*, 5 N. Y. 48 (55 Am. Dec. 304). It was alleged in the original answer that the laborers who cut said timber were at that time in the employ of the Wing Chin Lung Company and Johnson, but that they were acting under the orders of the latter. In the amended answer it is averred that Lee Tung Yin had no knowledge of the employment in which the laborers, or any of them, were to be engaged, except that they were to be employed in railroad construction ; and that all the acts complained of were done by said laborers under the exclusive control and direction of Johnson, and without the knowledge, consent, control, or direction of Lee Tung Yin. The original answer was offered in evidence, and testimony introduced tending to show that by securing an assignment of the subsidy contract and of Johnson's interest in the depot grounds, Lee Tung Yin undertook to build the first ten miles of railroad, and that the laborers who cut the timber were his servants. Yin, as a witness in his own behalf, testified that the original answer was prepared by his counsel, and that he subscribed his name thereto, and verified the pleading without observing the allegation that he was interested with Johnson in building the railroad. The testimony of C. E. Cochran, called by the plaintiff in rebuttal, would seem to imply that Yin was interested with Johnson in the enterprise ; but this witness had theretofore said that he did not understand that Yin was building the road, but that Johnson was constructing it, and that the former had taken an assignment of the subsidy contract and a conveyance of the depot rights in order to secure the payment of the money

which it would be necessary to advance to the laborers.

We think the evidence clearly shows that Yin never agreed to build any part of the railroad, and that he took said assignment and conveyance as security to indemnify him for the expense which his firm was obliged to incur. "The characteristics of the position of a master," say Roberts and Wallace, in their work on the Duty and Liability of Employers (3 ed.), 62, "are the following: (1) The engaging of the servant; (2) the payment of wages; (3) the power of dismissal; (4) the control of the servant's actions." In commenting upon the fourth distinguishing test of relationship, these authors say: "The power of controlling the servant's actions is undoubtedly the most important element for consideration in determining whether the relationship of master and servant exists between any two persons, and it is the only one which, by itself, can be at all depended upon; the chief value of the three tests above mentioned consisting in the assistance they afford in discovering the person who has this power, for the true principle of a master's liability to the public for the acts of his servants is that the master has control over their actions in their capacity as such, and that it is his duty so to exercise his control that no injury is occasioned by his business infringing upon the rights of third persons": Roberts and Wallace, Duty and Liab. of Emp. (3 ed.) 68. To the same effect, see Shearman & Redfield, Neg. (3 ed.) § 73; Thompson, Neg. 909; Wood, Mast. and Serv. (2 ed.) § 317; *Mound City P. & Color Co.* v. *Conlon,* 92 Mo. 221 (4 S. W. 922). The Wing Chin Lung Company and Ung Cuey engaged the Chinese laborers, selected as their bookman or foreman one Young John, who communicated and interpreted Johnson's orders to the laborers, kept their time, and was to pay them for their labor from money to be furnished by the Wing Chin Lung Company and Ung Cuey.

These laborers were undoubtedly the servants of the parties agreeing to furnish them, but such relationship would not preclude them from becoming Johnson's servants ; for, as was said by Mr. Justice MORTON in *Coughlan* v. *City of Cambridge*, 166 Mass. 268 (44 N. E. 218): " It is well settled that one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become, as to that service, the servant of such third party.  The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired."

It will be remembered that the laborers to be furnished by Wing Chin Lung Company were to work faithfully, and at such times and places upon the line of railway as they might be directed by Johnson's orders.  The court found that Lee Tung Yin had. supervision of said laborers, and employed and discharged them.  The record fails to show who was authorized to discharge these laborers, but, as the Wing Chin Lung Company engaged them, it may reasonably be inferred that they might dispense with their services ; and it may also be inferred that Johnson could discharge such of them as did not correspond with the terms of the agreement in respect to their being able-bodied and willing to work as directed. The supervision of the laborers by Lee Tung Yin, as found by the court, is probably predicated upon the selection of a bookman or foreman by the Wing Chin Lung Company, and from the following clause contained in their contract with Johnson, to wit : "And it is further agreed by the said party of the first part (Johnson) that payments for the work to be done and performed under this agreement shall be made on the fifteenth day of each month next succeeding the month in which such labor

is performed, and that the said party of the first part
will supply one of the parties of the second part, or an
agent to be selected by the parties of the second part,
free of cost of the parties of the second part, with trans-
portation to and from Portland and Union and to the
points where said laborers may be employed from time
to time, so as to enable the said parties of the second
part to oversee said laborers, supervise, and pay them
off." Young John, "the bookman or foreman" selected
by the Wing Chin Lung Company, as a witness for the
defendant, testified that he received orders from Johnson,
communicated them to the Chinese laborers, who per-
formed work as so directed, and that he kept their time,
so as to know what sums to pay them for their labor.

We think it can not be said, from the service rendered
by Young John, that Lee Tung Yin thereby "had super-
vision of the said laborers;" for, while the person so
selected is denominated a "foreman," it is evident that
he was employed as a "bookman" to keep a record of
the labor performed by the Chinese, and that he was
powerless to direct the time, place, or manner of service
to be performed by them. Nor do we think it is reason-
ably inferable from the clause of the contract so quoted
that Lee Tung Yin "had supervision of the said labor-
ers;" for, Johnson having stipulated that on the fifteenth
of each month he would supply one of the parties agree-
ing to furnish the laborers, or their agent, free trans-
portation from Portland and Union to the place where
said laborers might be employed, from time to time, so
as to enable such person to oversee the laborers, super-
vise, and pay them off, it is evident that no authority
was reserved to direct the laborers where to work, or to
prescribe the time or manner of their service. It is also
manifest, we think, that Young John was not the person
contemplated by the parties as the representative of the

Wing Chin- Lung Company "to oversee said laborers;" for the transportation of the former was stipulated for in another clause of the contract, to the effect that Johnson would pay one half of the fare of the first quota of laborers, including the "bookman," from Portland to Union. This deduction seems to be established by the fact that it was stipulated by the parties that the "bookman" would remain with the laborers during the time they worked for Johnson, while the agent who was to represent the Wing Chin Lung Company was expected to visit Union, or the place where the laborers were working, on the fifteenth of each month only; and hence we conclude that Lee Tung Yin did not have the supervision of the said laborers, but that, as far as he was able, he had surrendered the control thereof to Johnson, whose orders, as interpreted by Young John, they were bound to and did obey.

The decision we have reached in respect to the control of the laborers narrows the inquiry to whether Lee Tung Yin, who was in no manner interested in the construction of the railroad, and had no knowledge of the trespass prior to its commission, and never thereafter ratified it, is liable therefor because the servants engaged by his firm, and to which they looked for their compensation, did the cutting complained of in executing the orders of the person to whom they were hired. Notwithstanding there is a decided contrariety of judicial utterance upon the subject, it may be said, by way of illustration, though not involved herein, that it has been held that a master who hires his servants to another, to whom he has surrendered the entire control, is nevertheless liable for their negligence, upon the assumption that, having the selection of the servants chosen, it is reasonable that he who made the choice of a disqualified or careless person should be responsible for any injury that may result from the

negligence or want of skill of the person so employed :
*Hobbit* v. *London & N. W. Ry. Co.* 4 Exch. *254 ; *Stewart*
v. *California Imp. Co.* 131 Cal. 125 (63 Pac. 177). If it
be admitted that the rule just adverted to is applicable
in this state, it could have no bearing upon the case at
bar ; for the injury of which the plaintiff complains did
not result from any want of care on the part of Lee Tung
Yin, or of the firm of which he was a member, in the
selection of the laborers hired to Johnson. In *Ames* v.
*Jordan*, 71 Me. 540 (36 Am. Rep. 352), the plaintiff hired
to the defendant a pair of horses and furnished a driver
therefor, who was to use the team in hauling logs, and
while so employed the horses were drowned. In an
action to recover the damages thus sustained, it was held
that, if the loss was occasioned by the negligence of the
driver, no recovery could be had, but that if it resulted
from the defendant's want of care in providing a safe
landing place, he was liable therefor. Mr. Chief Justice
APPLETON, speaking for the court in deciding the case,
says : "It is true, the horses and driver were under the
control and management of the defendant, and he was
responsible for whatever was done in pursuance of his
orders. He was to see that the landing place provided
for logs was a safe one, and, if not so, he was responsible
therefor. The driver in obeying his orders, is his servant,
for whose acts he is liable so far as within the scope of
his employment ; but the results of his incompetency the
plaintiff must bear, for he should have furnished a suit-
able servant." Johnson, having directed the laborers
to cut the timber, is liable for the injury which resulted
from the execution of his order, and, as Lee Tung Yin
had no knowledge of the trespass prior to its commission,
did not ratify it thereafter, was not interested in the con-
struction of the railroad, and had no voice in directing
the laborers how, when, or where to work, he can not be

responsible for the injury which he was powerless to prevent, and hence the decree is reversed, and the suit dismissed.          Reversed.

Decided 10 June; rehearing denied 8 July, 1901.