## JOHN COUGHLAN *vs.* CITY OF CAMBRIDGE.

Middlesex.   March 20, 1896. — May 25, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & BARKER, JJ.

*Personal Injuries — Assumption of Risk — Liability of Municipal Corporation under Employers' Liability Act — Railroad — Special Servant — Notice.*

At the trial of an action for personal injuries there was evidence that the defendant, a municipal corporation, while improving its public grounds, was engaged in transporting gravel over a temporary track from a pit on its premises to a dump on the same premises by means of a locomotive, open gravel cars, and train hands hired by it from a railroad company, by which the track was owned and laid. While so engaged, the defendant's foreman at the dump ordered the plaintiff and other laborers to get on the cars and go back to the pit ; but whether he said anything as to where they should sit was in dispute. The plaintiff got on one of the cars, and, the floor being wet, sat on the edge, with his feet inside, holding on with both hands until thrown off and injured in consequence of the train passing rapidly over a switch, and then coming to a sudden stop.   *Held,* that the plaintiff did not assume the risk of such negligent management of the train, and was entitled to recover.

The employers' liability act, St. 1887, c. 270, applies to cities and towns.

A short and temporary track built and owned by a railroad company, which, together with a locomotive and cars, is hired from the company by a city for the purpose of transporting gravel over it in connection with public improvements, is a railroad within St. 1887, c. 270.

In an action against a municipal corporation for personal injuries, a notice under St. 1887, c. 270, which, after clearly stating the time and place of an accident, recites that the person injured was " thrown from and run over by a car on a gravel train, and seriously injured by the negligent management of the said train on the said switch by some one then and there in the service of said city, and who was intrusted with and exercising superintendence over the work in which I was then engaged, or who had charge or control of the switch, locomotive engine, or train then and there operated as aforesaid," with a further statement that the train, temporary track, and switch were defective and unfit for use, and that the injury was caused thereby, is sufficient.

A notice under St. 1887, c. 270, is not defective in alleging different causes of the same accident, each of which is adequately stated.

At the trial of an action against a municipal corporation for personal injuries received by a laborer in its employ through the negligent operation of a train of gravel cars, it appeared that, for the purpose of transporting gravel from one part of its premises to another, the defendant had made a contract with a railroad company by which the latter was to furnish a locomotive, cars, conductor, and trainmen to manage the same, to keep the locomotive and cars in repair, furnish fuel, supplies, rails, and ties, lay the track, and remove it when the filling was completed. The defendant agreed to pay a stipulated sum for the use of the track, cars, and trainmen, and to assume all risk of injury to the trainmen. The conductor had entire control of the train and trainmen, but it was his duty to have the train ready for the use of the defendant, from whose

foreman he took instructions as to the trips he made. The railroad company gave no directions in regard to the work, and exercised no control over the running of the train except so far as the conductor's oversight constituted such control. *Held*, that the conductor and other men employed on the train were the servants of the defendant.

TORT, for personal injuries occasioned to the plaintiff while in the employ of the defendant city. Trial in the Superior Court, before *Blodgett*, J., who allowed a bill of exceptions in substance as follows.

At the time of the accident, which occurred on October 5, 1892, the defendant was engaged, by means of a locomotive and train with hands to manage the same hired by it from the Fitchburg Railroad Company, in transporting gravel from one portion to another of certain premises held and owned by it, for the purpose of filling and grading grounds around its waterworks at Fresh Pond. The track used by it in that work was laid by the railroad company, to whom, with the exception of the ties, the track belonged, and by whom it was to be removed when the work was finished. By the contract between the city and the railroad company the latter agreed " to furnish for the use of the city a locomotive and twenty dump cars, together with conductor, engineer, fireman, and one brakeman to manage the same," to keep the locomotive and cars in repair, and to furnish fuel and supplies necessary for the same. The train was to be used to transport gravel and other material for filling around the northwesterly side of Fresh Pond, in Cambridge. The company also agreed to lay about one mile of track, to furnish rails, ties, and other materials for the same. The city agreed to pay $400 a mile for the use of the track, thirty-five cents apiece for the ties, and thirty-seven dollars per day, Sundays excepted, during the continuance of the work, and to assume all risk of injury to any of the trainmen.

At the time of the accident the process for transporting the gravel was for a train of cars which had been loaded at the pit to be drawn out on the track until it had passed a switch, when it was switched off and pushed toward the place where the gravel was to be dumped. The shape of the track used in this process resembled the letter Y, and the location of the pit and the dump would be represented respectively by the ends of the fork of the letter.

The plaintiff at the time of the accident was forty-three years old, and he had worked as section hand on a railroad and as general laborer on the streets of the defendant city. He had been employed at Fresh Pond nearly four months, having worked at the pit three weeks, and then at the dump. Occasionally he worked for a day fixing the track.

The plaintiff testified that on the day of the accident he was at the dump, and that his " boss," whom he called " Bill," ordered him and several of his fellow workmen to get on to the cars, which had just come from the pit, and that Conlan, who was in the pit and gave orders there, or some one, wanted them to go over to the pit. Before doing as ordered, the plaintiff and his fellow servants had to carry some tools to a tool-house eight hundred yards away, and the train was kept waiting for them for that purpose. Their overseer told them to hurry back, and when they returned told them to get on the cars. The plaintiff also testified that he was the first man to get on, and the overseer pulled another man on; that the train then started, but the plaintiff could not tell who signalled it to start; that it went all right until it reached the switch, when there was such a jar that it was impossible for a man to stand, and the plaintiff was thrown out and injured; that when the accident occurred he was sitting on the end of the car, holding on to both sides; that he sat between his hands, and the jar of the car caught hold of him, and all went, he could not tell how, it was done so quick; that there was no chance for him to recover himself; that he had been riding that way from the time he got on the train; that the train was made up of short, open, ordinary dump cars, which could be tipped to either side, that there were several in the car with him, some of whom rode on the side, and others as the plaintiff did, and that some of these were thrown off; that Bill was close by, he thought, in the same car with him; and that from the dump to the switch the cars ran for the first part of the way as fast as they would go on a railroad, but as they approached the switch they were not going very fast, and then they started up a little, and came to a sudden stop.

On cross-examination, he testified that during the three weeks he worked at the pit, the men rode in the cars to the dump; that they were not told how or where to ride, only to take their own

seats; that he never heard the men told to sit on the floor of the car, or cautioned against sitting on the sides, and that he had ridden on the cars three or four times from the pit to the dump; that when he got on the car the floor was wet and slippery, and he sat in the seat where it was dry; that he supposed it would have been safer to sit on the floor, but he had never seen anyone sit there; that he was on the rear car, sitting on the rail, with his back to the engine and his feet inside the car, holding on with both hands; and that Nevons was general superintendent and Conlan was in charge at the pit.

One Doran, a fellow workman of the plaintiff, who was also on the train at the time of the accident, testified that "the train went up to the switch as fast as any local freight he saw on a railroad, — it eased up about half way to the switch, and then went faster, and went over the switch as fast as it ever ran, — as a freight train runs between stations"; that when the cars reached the switch they "came to a standstill all of a sudden," the plaintiff and others were thrown out, and the witness, who was standing in the middle of the car, jumped out; and that Bill was accustomed to tell the men where to unload, but he never heard him give any other orders.

On cross-examination, he testified that he heard no orders about men sitting on the floor of the car, or as to how they should ride; and that Nevons had seen the men riding on the outside of the car with their feet on the truck, and holding on to the sides without saying anything about it.

Other witnesses for the plaintiff gave similar testimony as to the manner in which the accident occurred.

Conlan testified, for the defendant, that he was foreman at Fresh Pond under Nevons, in whose absence he had entire charge of the men; and that if a man were sitting on the edge of the car, which is something over two inches wide, and straight, with nothing to take hold of, his feet would touch the floor of the car, and that he gave orders to every man to sit in the middle of the car, or else to get on the engine.

On cross-examination, he testified that Leland, who was the man called Bill by the plaintiff, and one McBride, were looking after the men at the dump; that they and the witness directed the men to get on the engine and cars; and that if they got on the cars they were to sit down in the middle.

One Hildreth testified, in behalf of the defendant, that he was the conductor furnished by the Fitchburg Railroad Company, in the employ of and paid by the company at the time of the accident; that " he went there and came away as the city ordered him ; he was sent there to fill a contract with the city and to do whatever they wanted me to do; these instructions he got from the Fitchburg Railroad."

On cross-examination he testified that " as conductor he had charge of the train in a general way, that is, he furnished the train and saw that it was there ready for their use when they wanted it; it was my duty to have the train there to perform the services ; he took his instructions as to coming and going from the pit to the dump from Conlan, and at the dump would take them from Bill [Leland], or if he saw the cars were dumped he would go on with the cars ; . . . as far as instructions were given to him to deal with the train for the performance of the work he had to do, he received his instructions from Conlan at the pit, and from Leland at the dump; he had no direction over the work or the handling of the men, i. e. the shovellers and laborers ; as far as the running of the train was concerned, the train, and the trainmen were entirely under his control."

Hildreth and one Langley also testified that Leland was paid by the railroad company.

Within thirty days after the accident the plaintiff gave notice to the defendant as follows :

" I, John Coughlan, of Cambridge, in the county of Middlesex, hereby give notice to the city of Cambridge that, on Wednesday, October 5, 1892, at about two o'clock in the afternoon, at or near the switch nearest the gravel pit on the temporary track between the dump and the gravel pit, at the Belmont end of Fresh Pond in Cambridge, — said piece of track being locally known as the Belmont and North Shore Railroad, — I, while in the employ of said city, was thrown from and run over by a car on a gravel train, and seriously injured by the negligent management of the said train or the said switch by some one then and there in the service of said city, and who was intrusted with and exercising superintendence over the work in which I was then engaged, or who had charge or control of the switch, locomotive engine, or train then and there operated as aforesaid.

"And I further give notice that said train, temporary track, and switch were defective and unfit to be used for the purposes for which they were then and there used, owing to the negligence of city of Cambridge or of some one in its service intrusted by it with the duty of seeing that they were in proper condition, and that the injury I received as aforesaid was also caused by such defective condition and unfitness."

At the close of the evidence the defendant requested the judge to rule that the trainmen and the overseer Leland were not in law in the employ of the defendant, and that it was not responsible for the negligence of either, if such is proved; that the plaintiff, upon the evidence, was not a fellow servant of the trainmen and Leland, and the defendant is not responsible for their negligence, if such is proved; that even if the conductor, engineer, fireman, brakeman, and Leland were in the employ of the defendant, and if the plaintiff was also in its employ, and at work for it at the time of the injury, all were fellow servants, and if the injury resulted from the carelessness or negligence of such persons, either or all of them, in the prosecution of the work in which all were engaged, the defendant is not liable; that the defendant is not liable for an injury which was the result of the careless manner in which the plaintiff's fellow servants did their share of the work in which all were engaged; that under all the evidence in the case it appears that the plaintiff assumed the risk of riding in the car, and the defendant is not liable; that if the danger of riding in the car was known to the plaintiff, and he rode in it without protest or objection, he assumed the risk and cannot recover; that every employer has a right to judge for himself how he will carry on his business, and workmen having knowledge of the circumstances must judge for themselves whether they will enter the service of the employer, or, having entered, whether they will remain in such service; that if the plaintiff did not know and appreciate the danger of riding upon the car in the manner as testified, yet if he had ample opportunity to observe the danger of so riding he assumed the risk, and cannot recover; that upon all the evidence in the case the plaintiff was not in the exercise of due care, and cannot recover; that upon all the evidence in the case the plaintiff knew, or had ample opportunity to observe, the risk

of riding upon the cars, assumed such risk, and cannot recover; that the notice of the time, place, and cause of the injury is insufficient; that upon all the evidence of the case, upon each count, the plaintiff is not entitled to recover; and that under St. 1887, c. 270, called the employer's liability act, the defendant, a municipal corporation, is not responsible.

The judge declined so to rule, and instructed the jury, in substance, that the action could be maintained only if it came within the provisions of the St. 1887, c. 270; that the plaintiff must prove that the injury to him was caused by the negligence of the person or persons in the employ of the city of Cambridge having control of the locomotive or train of cars at the time the plaintiff was injured, and that the injury was caused by the negligence of such person or persons in the management and control of the train, including in the word "train" both the locomotive and the cars; that the first question to be considered was whether the plaintiff, at the time he was injured, was acting as an employee of the defendant, for otherwise the action could not be maintained; that for the purpose of calling attention to other things to be considered in the case, it must be assumed, if it is found that the plaintiff was injured, that he was then working for the defendant, between whom and himself the relation of employer and employee existed; that the statute provides for a recovery by the employee in certain cases, provided he, at the time, is himself using reasonable care and diligence; that in determining what is reasonable care the surroundings and circumstances of the case, what the plaintiff himself knew as to the danger of riding between the dump and the pit upon the cars from having previously ridden upon them, if he had in fact so done, and such knowledge acquired from observation as it may be assumed the plaintiff had in common with men in general as to certain natural laws, must be taken into consideration; that another useful test was to inquire what men of ordinary prudence and discretion would do under similar circumstances; that, applying this test, it was for the jury to consider whether the plaintiff was in the exercise of due care when sitting upon the car, — whether, if he was sitting with his back toward the locomotive, that fact was decisive of the question of due care; that if it is found that the plaintiff was an employee of the defendant,

and was, when injured, in the exercise of due care, the next question for the consideration of the jury was whether there was negligence on the part of the persons who had control of the locomotive and cars at the time when the plaintiff was riding upon them and was injured; that, by virtue of the contract between the railroad company and the defendant, the conductor and the other trainmen, who were in general employed by the railroad company, were, as matter of law, the employees or servants of the defendant at the time when the plaintiff was injured; that, in determining whether there was negligence on the part of those in control of the train, the jury were to consider what kind of a train it was, for what purpose the track was used, and that the cars were not designed or intended for the transportation of passengers; that they were to inquire as to the knowledge that the defendant and its servants had as to the use made of the cars, and whether it was a common thing for employees to be carried between the dump and the pit upon them, and, if so, how far should the conduct of those in charge of the train be affected thereby; that, if they did not know that the plaintiff and others were riding on the cars, it was to be considered whether they would have known it, or ought to have known it, had they used proper care; and that it was for the jury on the question of negligence to determine whether the train passed over the switch at an unreasonable speed, whether it came to a too sudden stop, whether the steam was wholly or partly shut off, and whether the brake should have been applied by the engineer or by the brakeman at the rear of the train, and if the jury should find that there was negligence on the part of the defendant or its servants which caused the injury to the plaintiff while he was employed by the defendant, and was in the exercise of due care, that the plaintiff was entitled to recover.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*G. A. A. Pevey*, for the defendant.

*J. W. Corcoran*, ( *W. B. Sullivan* with him,) for the plaintiff.

MORTON, J.    There was evidence that the plaintiff and others were directed by the " boss " at the dump to get on to the cars and go back to the pit to help fill them; that nothing was said as to where they should sit, though the evidence on this point

was conflicting; that the floor of the cars was wet; and that the plaintiff sat on the side or edge of a car, with his feet inside, and holding on with both hands. According to this, he was rightfully on the car, and we cannot say that his manner of riding was negligent.

There was evidence which warranted the jury in finding that the accident was due to negligence on the part of the engineer in passing over the switch at an unreasonable speed, and in bringing the train too suddenly to a stop.

Taking into account the nature of the risk, and granting that the plaintiff assumed the risk arising from the rough condition of the track, we do not think that he can be held to have assumed the risk caused by driving the train at an unreasonable speed over the switch, and then bringing it to a sudden stop. He would have no reason to anticipate in the ordinary conduct of the business such a mode of managing the train.

At the time of the accident the defendant was engaged, by means of a locomotive, and train and hands to manage the same, hired by it from the Fitchburg Railroad, in transporting gravel from one portion to another of certain premises held and owned by it in connection with its waterworks, for the purpose of improving the same. The track was laid by and with the exception of the ties belonged to the railroad, and was to be removed by it when the work was finished. The improvement which the defendant was engaged in making was for its own benefit and on its own premises; and where the relation of master and servant exists between employer and employed, as it did here between the plaintiff and defendant, and others engaged in the work, we see no reason why St. 1887, c. 270, should not apply to a city or town. See *Connolly* v. *Waltham*, 156 Mass. 368; *Hennessy* v. *Boston*, 161 Mass. 502; *Driscoll* v. *Fall River*, 163 Mass. 105; *McCann* v. *Waltham*, 163 Mass. 344. The track was a short and temporary affair, and the use of it and of the locomotive and cars was to continue only for a short time; but we think that it was a railroad within the meaning of the act.

We think that the notice was sufficient. The time, place, and manner of the accident are clearly stated. One statement of the cause was " the negligent management of the said train or the said switch by some one then and there in the service of

said city, and who was intrusted with and exercising superintendence over the work in which I was then engaged, or who had charge or control of the switch, locomotive engine, or train then and there operated as aforesaid." There was also a statement that the train, temporary track, and switch were defective and unfit for use, and that the injury to the plaintiff was caused thereby. We do not think that the notice is defective because it alleges different causes, each of which is adequately stated. See *Beauregard* v. *Webb Granite & Construction Co.* 160 Mass. 201; *Lynch* v. *Allyn*, 160 Mass. 248; *Brick* v. *Bosworth*, 162 Mass. 334. The defendant was not harmed by the omission to refer to the notice in the charge. The court had in effect ruled that the notice was sufficient, and the defendant had excepted to the ruling. The instructions requested did not call for further reference to the notice.

The defendant contends further, that the trainmen were not the servants of the defendant. By the contract between the city and the railroad company the latter agreed " to furnish for the use of the city a locomotive and twenty dump cars, together with conductor, engineer, fireman, and one brakeman to manage the same," and to keep the locomotive and cars in repair, and furnish fuel and supplies necessary for the same. The train was to be used to transport gravel and other material for filling around the northwesterly side of Fresh Pond in Cambridge. The company also agreed to lay about one mile of track to be used in said filling, to furnish rails, ties, and other materials for the same, and to take up and remove the track when the filling should be completed. The city agreed to pay $400 a mile for the use of the track, thirty-five cents apiece for the ties, and thirty-seven dollars per day, Sundays excepted, during the continuance of the work. It also agreed to assume all risk of injury to any of the trainmen. It is well settled that one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become as to that service the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired. *Johnson* v. *Boston*, 118 Mass. 114. *Clapp* v. *Kemp*, 122 Mass. 481. *Ward* v. *New England Fibre Co.* 154 Mass. 419. *Hasty* v. *Sears*,

157 Mass. 123. *Rourke* v. *White Moss Colliery Co.* 2 C. P. D. 205. In this case Hildreth, the conductor, testified on direct examination that " he went there and came away as the city ordered him ; he was sent there to fill a contract with the city, and to do whatever they wanted me to do ; these instructions he got from the Fitchburg Railroad." On cross-examination he testified that " as conductor he had charge of the train in a general way, that is, he furnished the train and saw that it was there ready for their use when they wanted it ; it was my duty to have the train there to perform the services ; he took his instructions as to coming and going from the pit to the dump from Conlan, and at the dump would take them from Bill [Leland], or if he saw the cars were dumped he would go on with the cars ; . . . as far as instructions were given to him to deal with the train for the performance of the work he had to do, he received his instructions from Conlan at the pit, and from Leland at the dump ; . . . as far as the running of the train was concerned, the train and the trainmen were entirely under his control."

There was testimony tending to show that one Nevons, who was in the employ of the city as superintendent of the waterworks, was the general superintendent of the work, and that Conlan and Leland were under him. There was no evidence that the railroad company gave any directions in regard to the work, or exercised any control over the running of the train, unless Hildreth's charge constituted such control. We think that the ruling of the presiding justice that the conductor, engineer, fireman, and brakeman were the servants of the city was right. The fact that the running of the train was entirely under the control of the conductor does not show that he and the others were not servants of the city. A locomotive and cars without men to run them would have been useless. Instead of hiring trainmen outside, the city hired them of the railroad with the train. No doubt it was expected by the company and the city that the men hired of the company would continue to run the train till the work was finished. But there was nothing in the contract which prevented the city from discharging the men, and hiring others in their places, if it saw fit to incur the additional expense which would be thus caused.

On the whole case, we discover no error in the rulings or refusals to rule. ·          *Exceptions overruled.*