SHERMAN WISE, *Appellee*, V. S. MORRIS LILLIE *et al.*
(THE SUGAR APPARATUS MANUFACTURING COM-
PANY, *Appellant*).

No. 16,862.

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Injury to Employee—Joint Under-
taking.* A contracted with B, a salt company, to erect an
evaporator system, twenty-five per cent to be paid down, the
remainder after its installation and meeting a required test;
if not successful, to be removed at A's expense and the twen-
ty-five per cent refunded; the apparatus to be placed on
foundations furnished by B, all other labor to be furnished
by B. A was to put an expert in charge of the operation of
the evaporator system until the test was successfully made.
B employed appellee to take instructions from the expert so
that he could learn how to operate the plant if accepted,
and he was introduced for that purpose to the expert, who
for six days directed appellee what to do respecting the
operation of the system, when, by the bursting of a boiler
therein, appellee was injured. *Held*, that appellee was a
servant of A, to whom A owed ordinary care.

2. ——— *Continuing Duty of the Master—Inspection of Ma-
chinery.* An instruction that it was the continuing duty of
A to use ordinary care to provide appellee with a safe place
in which to work and with safe machinery and appliances,
and to make such inspection as a person of ordinary care
would under like circumstances, upheld, although it was tes-
tified on behalf of A that it was not customary to inspect
boilers after they had been shipped by reputable manufac-
turers, except by pressure, as was done in this case.

3. EVIDENCE—*Expert Testimony—Province of the Jury.* A wit-
ness experienced in handling boilers was asked whether "after
having examined the door of this boiler A, and the door after
this accident, you can say from your knowledge and ex-
perience in the handling and using of boilers if a man in
the exercise of reasonable and ordinary precaution could have
told this boiler was defective in any way?" to which an ob-
jection was sustained. *Held*, that the question did not call
for expert evidence save in the slight degree furnished by the
experience of witness in handling boilers, and the ruling was
proper.

4. VERDICT AND FINDINGS—*Consistency—Permanency of Injuries.*

Wise v. Lillie.

The appellee, previously a workman in a mill, was by the injury in question thrown violently to the ground by the explosion and force of escaping steam, pieces of the exploded boiler-head breaking the water pipes above him, thereby releasing the water upon him with great force, so that he was unable to rise; was bruised upon the head, severely scalded, and was in the hospital four weeks and one day, was rendered more nervous than formerly, and has burning and itching from the scald. *Held*, that although he testified that he was earning the same wages as before in his former employment, a finding by the jury that his injury was such as to prevent him from performing regular labor such as he performed before the injury, taken together with the general verdict in his favor, may and should be harmonized therewith.

5. ——— *Notice by Master of Defective Condition of Appliances.* The court charged that if the unsafe and defective condition of the casting could have been discovered by reasonably careful inspection and vigilance the law would charge appellant with knowledge of such condition. The testimony showed that actual knowledge did not exist, but it was sufficient to support a finding that it could have existed by the exercise of reasonable care. The jury found actual knowledge. The general verdict was for appellee. *Held*, that such finding may and should be construed as equivalent to a finding that appellant should have had such knowledge, the legal and logical difference between such actual and constructive findings being more technical than substantial.

Appeal from Reno district court. Opinion filed February 11, 1911. Affirmed.

*F. F. Prigg*, and *C. M. Williams*, for the appellant.
*Frank L. Martin*, for the appellee.

The opinion of the court was delivered by

WEST, J.: The appellant contracted with the Carey Salt Company to furnish an evaporator system for manufacturing salt, guaranteeing, among other things, that it should have a certain salt-making capacity when working with ten pounds' pressure. The price was $23,200, f. o. b. Hutchinson, including the services of a skilled mechanic to superintend the erection of the ap-

paratus, the foundations to be supplied by the salt company, "all other labor to be furnished by the owners" (the salt company). Twenty-five per cent was to be paid down and seventy-five per cent thirty days after the completion of a six-days' test, in case such test should show a fulfillment of the guaranty, and in case it should not so show the salt company should be at liberty to refuse to accept the apparatus and should have refunded the twenty-five per cent paid, and the appellant should remove the apparatus at its own expense. The only mention of help to be furnished by the salt company was the one quoted—"all other labor to be furnished by the owners."

The apparatus consists in part of a system of four steam cylinders, or boilers, called "effects," A, B, C and D, into which exhaust steam from the salt company's plant was to be introduced, provision also being made for the introduction of live steam now and then when needed. These "effects," or boilers, could be worked in conjunction, in part or separate, by a valve system so that the pressure on each would be equal.

The amended petition charged, in substance, that on May 29, 1908, the boilers and apparatus had been placed and installed in the salt plant for experiment and trial and demonstration; that the connection between boilers A and B was broken and out of repair, so that A could not be used, and the apparatus would have to be changed in order to operate it upon "the triple effect," and appellee was instructed by the expert in charge to close a valve which permitted the steam to pass from A into the other boilers, and was informed that the expert would open the pipe and allow the exhaust steam to pass first into boiler D, which would thus permit such steam to operate under B, C and D only; that after he had obeyed this instruction the three boilers were thus operated through the night; that immediately before the injury, and eight or ten hours after the triple effect had thus been put in opera-

Wise v. Lillie.

tion, the expert wantonly and unnecessarily opened the live-steam valve, thereby permitting an "unusually, dangerous and excessive" head of steam to be turned into boiler A, which was cold, and disconnected; that the boiler, being constructed of cast iron, was wholly incapable of withstanding the pressure and immediately "exploded and bursted," the entire south end thereof, being the end nearest appellee, blew out with great force, breaking the cast-iron end into many pieces and causing a great quantity of live steam to escape upon appellee, throwing him violently to the floor and against the wall of the building, and that the force thereof was so strong that he was unable to rise; that the explosion blew the pieces of the boiler end against the water pipes above appellee's head, bursting the pipes and permitting the water to escape with great force upon him, so that he was unable to rise until the expert succeeded in turning off the steam and stopping the flow of live steam; that broken pieces of the casting struck appellee on each side of his forehead and on top of his head, and bruised and cut his head, the steam severely scalding him and burning him on his hands, arms, head, back and legs, permanently injuring him, damaging and shocking his entire nervous system, he suffering thereby great physical and mental pain and anguish and becoming thereby premanently nervous, and would be unable in the future permanently to regain his health and physical strength; that appellant knew that the boilers were made of cast iron and that such castings were likely to be defective and improperly cast and their strength not uniform throughout, and knew that they were not intended for, or capable of, holding a head of live steam; that they were defective and improperly made, and insufficient for a head of live steam, all of which could have been discovered by the appellant by reasonable care.

The answer was a general denial and a plea of contributory negligence.

The alleged negligence in turning in the live steam was eliminated by the findings returned by the jury, the result being a finding, in substance, that the appellant was negligent in respect to the casting which burst—that it was imperfectly constructed and that the appellant so knew; that the casting had become weakened by repeated expansion and contraction, due to heating and cooling, and that the cause of the casting exploding was turning live steam into effect A, but that it would not have exploded had it not been imperfectly constructed.

A general verdict was returned in favor of appellee and against the appellant only, other parties having been joined as defendants.

Complaint is made with reference to giving and refusing certain instructions, but owing to the circumscribed elements of negligence to which the jury's findings confine the case it is incumbent upon us to consider only two. After telling the jury that appellant's duty was to exercise reasonable care and diligence to provide appellee with a reasonably safe place to work and with reasonably safe tools, machinery and appliances to work with, and to exercise reasonable care and diligence to keep such tools, machinery and appliances in a reasonably safe condition, for the protection of appellee, the court added:

"(6) This duty is continuing in its nature and in its performances; it was the duty of the defendants to make such inspection of the machinery and apparatus as a reasonably prudent person ordinarily would under the circumstances, taking into consideration the nature of the machinery and apparatus, its conditions and the manner of its use."

Instruction No. 7 was to the effect that if the boiler head was defective, and unsafe by reason thereof, and the defect was known to appellant or would have been discovered by it by reasonably careful inspection and vigilance, the law would charge appellant with knowl-

·edge of such defect. It is insisted that these instructions, taken together, go too far as to the duty of inspection, in view of the fact that the evidence shows that boiler A had been tested by hydraulic and steam pressure, and shows also that no other kind of inspection is ever made of boilers after they are shipped by the manufacturers. But it can hardly be said that the evidence shows that no other kind of inspection ought to have been made, and doubtless the court and jury had this in mind, and we regard the language used in these instructions as correct and fair.

The appellant requested certain instructions to the ·effect that if appellee knew as much about the danger ·of the situation as the expert he could not recover. These were properly refused for the reason that appellee was sent to the place for the express purpose of learning all about the apparatus and its operation from the expert, who undertook to teach him what he came there to learn, and as the expert was a man of long experience in such work, and the appellee had been there only six days, we see no error or impropriety in refusing thus to instruct.

· An officer of the salt company testified as to his experience in handling boilers, and was asked whether, ·"after having examined the door of this boiler A, and the door after this accident, you can say from your knowledge and experience in the handling and using of boilers if a man in the exercise of reasonable and ordinary precaution could have told this boiler was defective in any way?" to which an objection was sustained. He had testified that it was not customary to inspect boilers which came from reputable manufacturers, but the question involves two elements of weakness; it was for the jury to say whether such custom was proper and a sufficient exercise of reasonable care or whether such care would call for inspection after receiving a boiler from the manufacturers, and as a portion of the boiler head was in evidence the jury

could tell as well what conclusion to reach by examin-- ing it after the explosion as the witness could. In other words, the question does not call for expert evidence save in the slight degree furnished by witness's experience in handling boilers, and we think the objection was properly sustained. (*Dow, Assignee, v. Julien,* 32 Kan. 576; *St. L. & S. F. Rly. Co. v. Ritz,* 33 Kan. 404; *Railroad Co. v. Chance,* 57 Kan. 40.)

In *K. P. Rly. Co. v. Peavey,* 29 Kan. 169, after quoting from *Morrigan's Appeal,* 29 Mich. 5, that "the experience of courts with testimony of experts has not been such as to impress them with the conviction that the scope of such proofs should be extended. Such testimony is not admissible in any case when the jury can get along without it, and it is only admitted from necessity, and then only when it is likely to be of some value," this court held that "the matters upon which the opinions were given in the evidence objected to were on questions which could have been decided by the jury on the facts; and of the facts, after a full hearing thereof, they were the competent judges." (p. 179.)

Two matters remain for consideration: What duty did appellant owe to appellee? Were the findings of the jury properly sustained? It is clear that appellant had constructed the apparatus for the salt company for its own profit and advantage, and to its advantage and profit a successful installation and test would redound. The appellee was employed and directed by the salt company to go to the place and learn the nature and operation of the evaporator apparatus, so he could become sufficiently proficient to operate it after it should be finally accepted. The expert who was to give him this knowledge was in charge of the apparatus, had had fourteen years' experience in erecting vacuum and evaporator processes and in constructing steam fittings. The appellee was brought to the expert, who was told that appellee was going to learn to operate

the machinery. The appellee began work May 23 and was injured May 29, having done in the meantime whatever he was directed to do by the expert in charge. The expert told him about what to do. The appellee testified:

"He told me to open and close valves in different parts of the machinery. . . . I was instructed to see that certain valves were closed and one valve was the exhaust line into the A boiler. . . . I had taken records of pressure an evening or two before when Mr. Applin [the expert] went to lunch about midnight. . . . I never assisted anyone else about it than Mr. Applin. . . . One of my duties was to go upstairs and see how much salt was making, and to oil the machinery up there, and I oiled the machinery in the vacuum room."

The salt company was purchasing this apparatus for the purpose of economizing in the manufacture of salt, and it was to its advantage, no doubt, to have it properly installed upon foundations supplied by itself and by labor furnished by it, and also to have the appellee so instructed by the appellant, through and by its expert in charge, that upon acceptance he might be able to operate the apparatus for the salt company.

The enterprise of installing the plant so as to meet the required test was one in which appellant and the salt company were jointly interested. The appellee was employed and paid by the salt company for helping in the joint enterprise to the extent of doing whatever he was directed to do by the appellant's expert. He was not a mere licensee, nor was he a fellow servant with the expert. He was practically the same as an employee, following the instructions and obeying the directions given by the man in charge. In principle his relationship to appellant was that of servant, within the meaning of *Fliege v. Railway Co.*, 82 Kan. 147, and appellant, as well as the salt company, owed him ordinary care. In *Atlantic Transport Co. v. Coneys*, 82 Fed. 177, it was held by the circuit court

of appeals of the second circuit that men working for a firm of jobbing carpenters employed by a steamship company to make repairs and alterations in their vessels, such jobbing firm charging for work by the hour and lumber by the foot, such employees being under a foreman of the jobbing company, were servants of the steamship company, its superintendents and captains having the right to direct the manner and extent of the repairs and alterations. The court said:

"The tendency of modern decisions is not to regard as essential or controlling the mere incidentals of the contract, such as the mode and manner of payment (*Corbin v. American Mills,* 27 Conn. 274), or whether the owner can discharge the subordinate workman, and not to regard as essential, or an absolute test, so much what the owner actually did when the work was being done as what he had a right to do." (p. 178.)

(See, also, *Coughlan v. Cambridge,* 166 Mass. 268; *Consolidated Fireworks Co. v. Koehl,* 190 Ill. 145; *Grace & Hyde Co. v. Probst,* 208 Ill. 147; *Hannegan v. Union Warehouse Co.,* 38 N. Y. Supp. 272; *Alabama Great Southern R. R. Co. v. Burks,* 148 Ala. 113.)

In volume 1 of Dresser's Employers' Liability it is said:

"The unfailing test of the existence of the relation is the power of direction or control. It must be possessed by a master, though it may not be exercised, or exercised through the hands of an agent. The right of direction covers not only the general objects or method of the work, but extends to every detail of it. The discretion of the servant is constantly subject to this control—a test which stamps him as a servant and not as an independent contractor.

"A volunteer may become a servant, and subject himself to the duties and the rights attending the relationship, if his services are accepted by the master, who personally, or through his duly authorized agent, acquiesces in the employment." (p. 54.)

It is urged that two of the findings in particular are not supported by the evidence. These are numbered 8 and 22, and by one the jury decided that the appellant

knew of a defect in the casting that burst, before it did burst, and by the other that appellee's injury was such as to prevent him from performing regular labor such as he performed before the injury. He was allowed $1000 for permanent injury. Of course the only explanation of finding No. 8 is that the jury, having been instructed that means of knowledge is equivalent to knowledge, found the existence thereof, and the only trouble with the finding is that it confuses the effect with the means—the actual condition with the legal result thereof. Had the finding been that appellant, by the exercise of reasonable care, could have discovered and known of the defect, no just fault could have been found. But there was the evidence and there was the instruction, and the jury, in substantial compliance with both, not being composed of lawyers or logicians, reached a conclusion which, while technically susceptible of criticism, is substantially sound, and no reversible error was committed by permitting such finding to stand. The other finding is said to be invalidated by appellee's testimony that he had gone back to work at his former task in a mill and was earning the same wages as before. But, considering the general verdict in his favor, his testimony as to pain and suffering, itching and nervousness, and the testimony of his physician that the itching might or might not disappear, and would make him nervous, we think the necessary task of reconciling, if possible, this finding with the general verdict must result in holding that, taken together, they mean that appellee, though at the time of trial earning his former wages, was earning them less easily than before, and may later on be unable to earn them at all or to earn as much. It is difficult to understand how one could undergo the injury detailed by him and not be permanently disabled.

A portion of the broken boiler head is in evidence. It shows that in its molding a cold shut or cold shot

occurred, that is, the molten metal failed at one place to unite and blend perfectly, leaving a sort of seam, which made its strength less than one of equal thickness perfectly molded. The jury found, in substance, that this casting, being imperfect and too thin, became weakened by expansion and contraction, and that the proper introduction of live steam caused the explosion. The contract with the company which furnished this casting to the appellant, from specifications and drawings furnished by appellant, called for a casting three-fourths of an inch in thickness. The fragment in evidence is by actual measurement materially less than three-fourths of an inch thick at the thickest place where the seam appears, and is a scant three-eighths of an inch thick in the greater portions thereof. The testimony shows that the boiler head was not examined or tested save by hydraulic and steam pressure, appellant assuming that the old-established and reputable concern which furnished it would not supply a defective casting. The appellant had by its engineer carefully made drawings and specifications, assuming in the calculations a large factor of safety, and "took it for granted that the apparatus would be constructed according to the drawings."

While the defective boiler head was painted, still the jury evidently believed, and we think justly so, that by the exercise of reasonable care in actually examining into the sufficiency of the casting, instead of assuming it, the appellant might have ascertained its defects and prevented the injury.

The judgment is affirmed.