DOYLESTOWN AGRICULTURAL COMPANY  .

*vs.*

BRACKETT, SHAW & LUNT COMPANY.

York.   Opinion August 13, 1912.

*Assumpsit.   Account.   Agent.   Contract.   Consignment.   Delivery.
Damages.   Exceptions.   False Representations.   Inducement.
Purchaser.   Rescind.   Recoup.   Waiver.*

1.  On March 12, 1909, the plaintiff and defendant made a contract in writing, whereby the plaintiff sold and the defendant bought a certain number of cultivators.   In the contract it was agreed that all of these cultivators remaining unsold September 1, 1909, should revert and become the property of the plaintiff, without recourse to the defendant.   It was further agreed, by the plaintiff, "as a condition," that one J. P. Algire should go to Caribou with the defendant's president, and endeavor to the best of his ability to make sales of the cultivators, and the defendant agreed to bear Algire's travelling expenses.   The defendant received the cultivators.   Algire went to Caribou and elsewhere with the defendant's president, and assisted in the sale of the cultivators to various retail dealers.

2.  In a suit to recover the contract price, held that Algire in negotiating the sales to dealers was the agent of the defendant, and not of the plaintiff, and that his false and material representations to the purchasers respecting the physical construction of the cultivators afford no defence to the suit, even though Algire may have been, for other purposes, the plaintiff's agent.

3.  Also held that cultivators "consigned" by the defendant to dealers were not "sold" within the meaning of the contract; that cultivators delivered to dealers on their written orders, by which they become bound to pay for them, with a stipulation that the title should remain in the defendant, until the price was paid, were "sold" within the meaning of the contract.

4.  That a sale of cultivators upon an order which stipulated that all cultivators not sold by the purchaser this season will remain the property of the vendor is in effect a sale of so many only as the purchaser shall sell during the season.

5. An excepting party must set forth enough in his bill of exceptions to enable the court to determine that the point raised is material, and that the ruling complained of is both erroneous and prejudicial, or he can take nothing by his exceptions.

6. When a bill of exceptions states that the report of the evidence on the motion for a new trial may be referred to as explaining the bill, the evidence is not thereby made a part of the bill. It may be referred to to explain the bill, but not to add to it.

On motion and exceptions. Exceptions overruled. Motion overruled, if plaintiff remits all of the verdict in excess of $2133.28 within thirty days after the certificate is filed; otherwise motion sustained.

This is an action of assumpsit to recover the price of certain agricultural implements and fittings sold and delivered to the defendant, amounting to $4,607.35. The plaintiff recovered a verdict for $3,958.35. Plea, general issue and brief statement.

The case is stated in the opinion.

*Leroy Haley,* for plaintiff.

*Mathews & Stevens,* for defendant.

SITTING:   WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, BIRD, JJ.

SAVAGE, J.   Assumpsit upon an account annexed to recover the price of certain agricultural implements and fittings sold and delivered to the defendant, amounting to $4,607.35. The plaintiff recovered a verdict for $3,958.44. The case is before this court upon the defendant's motion for a new trial, and twenty-eight exceptions to the exclusion of evidence.

As the merits of nearly all the exceptions are necessarily involved in the determination of the rights of the parties under the motion, it will not be necessary to consider them in detail.

These facts appear. On March 12, 1909, the parties made a written contract, which, so far as material to the discussion of the case, contained the following provisions:—The plaintiff sold and the defendant bought fifty cultivators for $1125. The delivery was to be F. O. B. cars at Caribou, Maine. Additional orders for like merchandise, shipped during the life of the contract, were to be subject to its prices, terms and conditions. The agreement was to

terminate September 1, 1911. The terms of settlement were "Net cash, October 1, 1909." All cultivators remaining unsold by the defendant September 1, 1909, were to revert and become the property of the plaintiff, without recourse to the defendant. It was agreed "as a condition" that one J. P. Algire should go to Caribou with the defendant's president, Brackett, and endeavor to the best of his ability to make sales of the number of cultivators specified. The defendant agreed to bear Algire's actual traveling expenses from Philadelphia and return, and his hotel bills while making the sales. It would seem that this contract was originally made by Algire as special agent for the plaintiff, subject to approval, and it was afterwards approved by the plaintiff.

The fifty cultivators specified in the contract, and one hundred and eight others, under the terms of the contract, were delivered to the defendant, or on the defendant's order, at different places in Maine in April or May, 1909, at agreed prices, amounting to $3552.50. The defendant is charged with $310.56 for certain fittings and other merchandise, of which it acknowledges a liability for $81.99. Its liability for the remainder depends upon its liability for the cultivators. The rest of the account relates to threshers and fittings, and for one of these, with articles accompanying it, amounting in all to $235, the defendant denies any liability whatever.

Of the one hundred and fifty-eight cultivators received by the defendant, it disposed of one hundred and four to various local dealers in agricultural machinery on their written orders by which they respectively became bound to pay for the cultivators ordered, with a stipulation in each order "that the title to said machinery shall remain in and with Brackett, Shaw & Lunt Co." until paid for. And in one such order for fifty cultivators, dated March 31, 1909, it was also stipulated that "all cultivators not sold this season will remain the property of Brackett, Shaw & Lunt Co." The price, to the defendant, of these cultivators was $2373.50. The orders or contracts which the defendant took from dealers for the other fifty-four cultivators were not put into the case. But the plaintiff's president on cross-examination was shown these contracts, and inquired of, without objection, as to their contents. The contracts themselves, of course, were the best evidence. But the witness's

testimony is the best we have before us, and having been given without objection, it must be considered. That testimony shows that twenty-seven cultivators were sold outright to dealers for $607.50, and twenty-seven were consigned to dealers at the same price. And while some of these orders from dealers were taken in the plaintiff's name, they were taken on the defendant's account, and were so recognized.

The defense, as to the cultivators, as outlined in the defendant's brief statement, is two-fold. First, that as an inducement to the defendant to contract for the cultivators, the plaintiff or its agents, falsely represented that the cultivator in question, known as the New Age cultivator, was identical with the Iron Age cultivator which was then being sold and which was well and favorably known among the farmers of Aroostook County, in which locality the larger part of the cultivators were intended to be put on sale; and that the parts of the New Age were interchangeable with those of the Iron Age. As to this defense, it is necessary to say only this. While it is true, that under the circumstances of this case, such representations about the physical characteristics of the cultivators to be purchased, made to one who had no opportunity to know the true facts, would be material, and, other necessary elements being proved, if the representations were false, the defendant would be entitled either to rescind, or to recoup in damages, but unfortunately for that defense, there is no evidence in the case to support it. The defendant did not rescind and restore, for any cause; nor is there any basis shown for recoupment on account of material false representations.

Secondly, that in accordance with the original contract Algire went to Aroostook County, with Brackett, and helped him secure orders from dealers for substantially all of the one hundred and fifty-eight cultivators; and that in selling these cultivators Algire made false representations, on the strength of which the sales were made. Many of the representations claimed to have been false were manifestly immaterial, for they were merely the expression of Algire's opinion. But it is claimed, and proven too, that Algire did represent the cultivator as being like the Iron Age, with which the purchasers were familiar, so like it, indeed, that the parts of the two cultivators were interchangeable. That we think was material.

And it is shown that the representations were false.  It is not shown that Mr. Brackett knew them to be false.

The dealers undertook to sell the cultivators to their customers. They did sell some.  But in the end the customers, all but two, returned them to the dealers.  The complaint in general was that the cultivator was not adapted to the Aroostook soil, which was probably true, but which so far as we can see, is not material to any legitimate issue in this case.  But the specific complaint in many cases concerned a wooden pin brake in the New Age, which was one of the many features in which the New Age was not like the Iron Age.  Although some of the dealers notified the defendant of the troubles, none of them appear effectually to have rescinded their contracts.  They stored, but did not restore, the goods, without which, or a waiver of it, rescission is ineffectual.

Under this condition of things, and assuming that the individual purchasers were justified in returning the cultivators to the dealers, (though it does not anywhere appear upon what terms or representations any individual purchaser had made his purchase, or whether he had a right to rescind) we come now to consider the defendant's contentions respecting the consequences of Algire's false representations.  It contends that in selling or consigning cultivators to dealers, Algire was the plaintiff's agent, for whom the plaintiff was responsible.  From this premise it is argued that if Algire made false representations, they were the plaintiff's false representations, and that if in consequence of these representations the dealers had the right to rescind and did rescind, the plaintiff cannot justly claim, nor lawfully maintain a claim, that the cultivators were sold prior to September 1, 1909, within the meaning of the contract.  Even if all the defendant's premises were sound, it is unnecessary to inquire whether the conclusion would follow, and whether the cultivators would have remained unsold September 1, 1909, and would have reverted and become the property of the plaintiff, as provided by the contract, and no action for their price would lie against the defendant.

For we think the essential premises of the defendant's contention are not sound.  We have already noticed the failure on the part of the dealers to make complete rescission.  We think also that Algire must be regarded as the defendant's agent.  It may be granted that

Algire was in the employment of the plaintiff in some capacity. And it must be assumed, under the language of the contract relating to Algire's expenses, that, unless Algire worked for nothing, which is not to be assumed, the plaintiff paid him for his services in selling these cultivators. Nevertheless, in making these sales he was the defendant's agent. The legal relationship, whatever it was, was created by the written contract, and what it was must be determined by the terms of the contract, read in the light of existing conditions. The situation contemplated by the contract was the one which actually existed. The contract for the purchase was executed. The defendant was the purchaser and owner. It had the cultivators to sell, and wanted to sell them. That was the defendant's business, not the plaintiff's. The plaintiff was not the seller. It was not interested in the business, alone, or jointly with the defendant. It had no interest in the sales, except as any manufacturer is interested to increase his output, and as in this case it was interested to have as many cultivators as possible sold before September 1. For these reasons, as well as for the sake of inducing the defendant to contract at all, the plaintiff may have been willing to help the defendant make its sales, to the extent of paying for the service of the helper. Still it was, primarily, the business of the defendant, and at the most, the plaintiff's interest was only incidental and secondary. In this aspect, it is immaterial what the relations of Algire to the plaintiff were in other respects. Nor was the legal relation changed by the fact that Algire in some contracts assumed to sign for and represent the plaintiff, because, in the first place, there is no authority shown from the plaintiff, and, besides, the defendant recognized those contracts as its own, and ordered from the plaintiff the cultivators which those contracts called for. In short, on the assumption that Algire was in other respects the plaintiff's servant, the plaintiff loaned him to the defendant for a particular service. And while he was engaged in that service, he was, as to that service, the servant and agent of the defendant. *Wyman* v. *Berry,* 106 Maine, 43; *Coughlan* v. *Cambridge,* 166 Mass., 268; *Clapp* v. *Kemp,* 122 Mass., 481. The defendant assumed the responsibility for whatever Algire might do or say. Algire's representations, in law, were the defendant's representations, for the consequences of which the defendant cannot have

recourse to the plaintiff. Whether the dealers had a right to rescind their contracts, or whether they did effectually rescind is immaterial in this suit. The defendant cannot avail itself of Algire's false representations as a defense.

In thus overruling the contention of the defendant we necessarily overrule the defendant's exceptions to the exclusion of evidence which are based upon that contention.

Of the remaining exceptions, one requires particular examination. Mr. Brackett, the president of the defendant, after testifying generally in direct examination about the interview between himself and Mr. Shaw, the defendant's treasurer, on one side, and Mr. Mills and Mr. Algire, respectively treasurer and agent of the plaintiff, on the other side, in which the parties were negotiating the contract for the purchase of the New Age cultivators, was asked, "What did Mr. Mills and Mr. Algire say to you and Mr. Shaw in regard to the cultivators?" The question was objected to upon the ground "that the negotiations resulted in a written contract, which contract is the best evidence." The answer was excluded, and an exception was taken. This is all that the record before us discloses. The purpose of the inquiry does not appear.

If the proposed testimony related to matters subsequently embodied in the written contract, and tended to alter the terms of that contract, the objection was well taken. But if, as is claimed in the brief for the defendant, the purpose was to show that Mills and Algire made representations concerning the physical characteristics of the cultivators, which afterwards turned out to be false, namely, that they were like the Iron Age in construction, then the testimony was admissible. For if false representations material in character, are made to induce the making of a written contract, and they are relied upon, and a written contract is made accordingly, the false representations underlie the written contract itself. They do not alter the contract, but they may afford a reason why the contract itself may be avoided or rescinded, or if that be not done, why the injured party may recover damages, or recoup damages if sued on the contract. Representations of the physical characteristics of a thing sold, and not open at the time to inspection, when made by a vendor as an inducement to purchase, are in the nature of warranties, for breach of which the purchaser may rescind the con-

tract and restore the articles purchased, or may recoup in damages, when sued for the purchase price. So that if the defendant could have shown false representations material in their character, made as an inducement to the written contract, and relied upon by it, and had offered to show them, it would have been error to exclude them.

But the difficulty is that that purpose nowhere appears in the record. It does not appear in the bill of exceptions. There is nothing in the bill itself to show that the inquiry was relevant or material. It is true that the bill states that the report of the evidence on the motion for a new trial may be "referred to as explaining this bill of exceptions." Even so, the evidence is not made a part of the bill of exceptions. It may be referred to to explain, but not to add to the bill. But if it were a part of the bill, it would not aid the defendant, for as we have seen, the report of the evidence is silent on the subject. So far as the record goes, we can only surmise, and that we are not permitted to do.

It is the well settled rule in this State, too well settled to be now shaken, that the excepting party, in his bill of exceptions, must set forth enough to enable the court to determine that the point raised is material, and that the ruling excepted to is both erroneous and prejudicial, or he can take nothing by his exceptions. The exceptions must show error affirmatively, and that the excepting party is aggrieved. *Jones* v. *Jones,* 101 Maine, 447, and many cases there cited. In order to sustain an exception to a ruling excluding a conversation, the exceptions must disclose what the conversation was. *Johnson* v. *Day,* 78 Maine, 224. To lay the basis for an exception, when a party offers evidence which is objected to, he should state the grounds, as he claims, of its admissibility. *McKown* v. *Powers,* 86 Maine at p. 295; 1 Wigmore on Ev. p. 51; 2 Cyc., 697, and cases cited. It follows that this exception must be overruled.

The exception to the exclusion of the York contract falls within the same principle. The York contract was one of those already referred to by which the defendant sold cultivators to dealers. It was unquestionably admissible. But the defendant had already cross-examined the plaintiff's president with reference to this contract, and in that way had got into the record all of the contract which was relevant to any issue which has been raised, so far as

the record advises us. If there were still other pertinent matters in the contract, the bill of exceptions should have shown it. It is not made to appear that the defendant was aggrieved by the exclusion.

The few remaining exceptions have been examined, but we find no merit in them,—nothing that calls for discussion. They relate to matters that are manifestly immaterial.

We find no defence to so much of the plaintiff's claim as relates to cultivators and fittings which were sold by the defendant before September 1, 1909. As already stated, the case shows that twenty-seven were sold to dealers outright. There were one hundred and four contracted for by dealers who obligated themselves to take and pay for them, but the title to which was to remain in the defendant until they were paid for. And of these one hundred and four, there were fifty concerning which it was agreed "that all cultivators not sold this season will remain the property of Brackett, Shaw & Lunt Co." There were twenty-seven consigned to dealers.

We think that the fifty-four cultivators which were sold on the special contracts, reserving title as security for payment and without other stipulation as to ownership, should be regarded as "sold" within the meaning of the contract, and that the twenty-seven cultivators which were consigned were not "sold." Those in the first class were "sold" within the common acceptation of that word. The dealers ordered them and agreed to pay for them. The title was reserved merely as security for payment. The transaction had all the characteristics of a sale of chattels, with mortgage back to secure payment of the purchase price. *Westinghouse Co.* v. *Railroad Co.,* 106 Maine, 349. In the case of cultivators consigned for sale, there was no contract to buy, no agreement to pay, unless the goods were sold. The consignee was under no obligation, except to account for the proceeds of the cultivators sold. The cultivators were merely placed with the consignee on sale. All this must be inferred, since there is nothing to show that these consignments were out of the ordinary. As between the plaintiff and defendant, they remained unsold September 1, 1909.

The fifty cultivators which were sold on special contract, reserving title, concerning which it was also agreed that all remaining unsold during the season should remain the property of the defend-

ant, present a different question. It was not merely a reservation of title. It was a limitation of the number sold, for which the purchaser was accountable. It was in effect a sale of so many only as the purchaser should sell during the season. The purchaser was bound for no more. The evidence shows that only one was sold.

A word as to the threshers sued for. They are three in number. The defendant denies liability for one. It claims that it did not order it. The evidence strongly supports the defendant's contention. And a careful analysis of the figures leads us to believe that the jury disallowed that thresher. On the other two threshers, the defendant claims and is entitled to have a discount of $160.36, in accordance with the contract.

In summarizing, we will start, for convenience, with the amount charged in the plaintiff's bill, $4607.35. From this amount should be deducted the amount charged for one thresher, and items connected with it, $235; the discount on the other threshers, $160.36; the amount charged for the consigned cultivators, $607.50; the amount charged for the forty-nine other cultivators remaining unsold September 1, 1909, $1102.50. At the trial it was admitted that the defendant was entitled to credit for $500.16 for freight paid and other credit items. It may be that the discount on the threshers was included in this amount, but the record fails to show it, and we must take the record as it is. Making these deductions, there is left $2001.83 which was due at the date of the writ. If interest be added on this amount to the date of the verdict, the total amount is $2133.28. And for this amount the plaintiff was entitled to a verdict, and for no more. The verdict rendered for $3958.44 was therefore demonstrably excessive.

Accordingly the certificate will be,

> *Exceptions overruled. If the plaintiff within thirty days after the certificate is filed remits all of the verdict in excess of $2133.28, motion overruled; otherwise, motion sustained.*